Michael C. McKay, SBN 023354
SCHNEIDER WALLACE
COTTRELL KONECKY
WOTKYNS LLP
8501 North Scottsdale Road, Suite 270
Scottsdale, Arizona 85253
Telephone: (480) 428-0142
Facsimilie: (866) 505-8036
mmckay@schneiderwallace.com

Joshua Konecky, CA SBN 182897 *(Pro Hac Vice application to follow)*
Leslie H. Joyner, CA SBN 262705 *(Pro Hac Vice application to follow)*
SCHNEIDER WALLACE
COTTRELL KONECKY
WOTKYNS LLP
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
jkonecky@schneiderwallace.com
ljoyner@schneiderwallace.com

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| ORSON JUDD, an individual, on behalf of himself and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> KEYPOINT GOVERNMENT SOLUTIONS, INC., a Delaware corporation, <br><br> Defendant. | **COLLECTIVE ACTION COMPLAINT UNDER THE FAIR LABOR STANDARDS ACT (FLSA), 29 U.S.C. § 201,** *et seq.* <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Orson Judd ("Plaintiff") by and through his undersigned attorneys, hereby brings this Collective Action Complaint on behalf of himself and all others similarly situated, against Defendant Keypoint Government Solutions, Inc. ("Defendant"), and alleges as follows:

# I.  NATURE OF THE CASE

1.      This is a collective action under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*. ("FLSA"), arising out of Defendant's ongoing and willful misclassification of its "Investigators" as "independent contractors" instead of "employees."  Under the FLSA, employees are entitled to overtime premium wages for all hours worked beyond 40 in a workweek.  Independent contractors do not have this legal right.  Thus, Defendant's willful policy of misclassification has allowed it to decrease its bottom line by wrongfully and illegally withholding the overtime wages that it owes to its numerous Investigators across the country.

2.      On September 29, 2011, the Internal Revenue Service (IRS) provided a seven-page determination letter to Defendant's CEO, Jeff Schlanger, explaining its conclusion that Defendant had misclassified one of its Investigators as an independent contractor rather than an employee.  A copy of the letter is attached to this Complaint as Exhibit A.  The IRS letter identified numerous reasons why the Investigator should have been classified as an employee.  The IRS letter also references Defendant's potential tax liability for not paying employment related taxes as a result of misclassifying the Investigator as an independent contractor rather than employee.  As it turns out, Defendant employs thousands of Investigators across the United States who perform the same kind of work as this Investigator, under the same corporate-wide constraints, policies and procedures of Defendant that lead to the IRS determination.  Defendant neither pays these Investigators overtime, nor does it pay employment taxes to the government pertaining to their employment.

3.      In or around 2014, Defendant reclassified all its Investigator in California as employees.  Defendant, however, continues to classify numerous Investigators in other states as independent contractors, even though they do the same kind of work under the same or substantially similar policies, procedures and constraints as the Investigators properly classified as employees.  Defendant willfully continues to classify numerous Investigators as independent contractorss—and deny them their legal right to overtime wages—despite knowing that the classification is unlawful.

4.      The Investigators perform background checks, an integral part of Defendant's business as a provider of background checks to the federal government.  The Investigators also routinely

work more than 40 hours a week.  They perform traditional investigative work (e.g. tracking down witnesses, interviewing witnesses, finding and reviewing public records, etc.).  They also spend additional time writing reports on their investigations for Defendant to submit to the government.  The investigative work must generally be performed during regular business hours and is itself a full time job.  On top of the 40 or more hours per week spent on this work, the Investigators must spend substantial additional time after hours to write-up their reports, and must do so under deadlines imposed by Defendant.  As a result, the Investigators, including Plaintiff, regularly work well over 40 hours per week, but do not receive any overtime pay.

5. Defendant owes its Investigators overtime pay for their overtime hours because Defendant is the legal employer of the Investigators.  The Investigators perform an integral part of Defendant's business and Defendant retains the right to exercise extensive control over the way the Investigators perform their jobs.  Among other things, Defendant retains the right to control the Investigators' pay rate, hours, deadlines, forms and scripts for interviews, quality control on reports ultimately submitted to the government, and other details of the job.  Moreover, Defendant does not permit its Investigators to submit reports to the government until Defendant has completed an extensive "Case Review Process."  Defendant treats the Investigators as employees in every material respect, except that it has misclassified an entire class of them as independent contractors.

6. Although Defendant has misclassified Plaintiff and numerous other similarly situated Investigators as independent contractors, it simultaneously has classified another subset of Investigators as employees.  The Investigators classified as independent contractors are subject to the same or similar rules, procedures, responsibilities and level of control as those classified by Defendant as employees.  Other than the number of hours worked or whether the worker is paid overtime and other benefits, there is no material difference between them.  They all are "employees" under applicable law.  Yet, Defendant has misclassified a whole category of them as "independent contractors."  Using this classification scheme, Defendant has failed to pay these Investigators the full wages and employment benefits they are due.

7. Defendant's unlawful classification of Plaintiff and other similarly situated

Investigators as independent contractors is part of an unlawful policy and practice to evade the overtime obligations and other responsibilities that employers owe to their workers and the government under the FLSA and applicable tax laws. Defendant has violated and continues to violate the overtime requirements of the FLSA, 29 U.S.C. § 207(a), and the applicable Regulations of the Department of Labor.

8. Defendant's violations have been willful under 29 U.S.C. § 255(a). Defendant has known that its classification of Investigators as independent contractors violates the FLSA since at least September 29, 2011, when the IRS concluded that Defendant had misclassified a California-based Investigator as an independent contractor when in fact he was an employee. See Ex. A. That Investigator, Michael Sgherzi, later filed a class action under California law in or around June of 2014, which included claims for violations of the FLSA. As a result of the California lawsuit, Defendant reclassified its Investigators in California as employees, but did not reclassify Investigators in other states. These facts and others demonstrate that Defendant has acted willfully in misclassifying the Investigators as independent contractors rather than employees. Thus, Plaintiff is entitled to recover damages under FLSA's three-year statute of limitations, which is applicable to willful violations.

9. This action follows an earlier filed action against Defendant, *Richard Smith, et al. v. KeyPoint Government Solutions*, Case No. 1:15-cv-00865 (D. Colo.) ("*Smith* Action"). During the pendency of the *Smith* Action, Defendant required all of its Investigators to execute new contracts, which included an arbitration agreement and collective action waiver. However, because the Ninth Circuit has held that collective action waivers such as the one contained in Defendant's arbitration agreement are unenforceable under the National Labor Relations Act (see *Morris v. Ernst & Young, LLP*, 834 F.3d 975 (9th Cir. 2016) petition for cert. granted 2017 WL 125665 (Jan. 13, 2016)), Plaintiff is entitled, under the law of this Circuit, to pursue his claims in this Court action.

10. Plaintiff Orson Judd brings this collective action under the FLSA, 29 U.S.C. § 216(b), on behalf of himself and other similarly situated individuals who worked for Defendant as Investigators in the United States, while being classified by Defendant as independent contractors at

any time beginning three years before the filing of this Complaint and/or the filing of consents to become party plaintiffs (including the time period Plaintiff's and others' claims were tolled by the filing of consents in an earlier filed action, *Richard Smith, et al. v. KeyPoint Government Solutions*, Case No. 1:15-cv-00865 (D. Colo.)), plus additional time for other periods of equitable tolling.

11. Plaintiff challenges Defendant's policies of: (1) classifying Plaintiff and other similarly situated Investigators as independent contractors instead of employees; and (2) failing to pay Plaintiff and other similarly situated Investigators overtime wages for hours worked in excess of 40 in a week. Plaintiff seeks compensation in the form of back wages, including overtime wages; an additional equal amount as liquidated damages; and interest to the full extent permitted by the FLSA. Plaintiff, on behalf of himself and all others similarly situated, also requests reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 216(b).

## II.     VENUE AND JURISDICTION

12. The FLSA authorizes private rights of action to recover damages for violations of the FLSA's wage and hour provisions. 29 U.S.C. § 216(b).

13. This Court has jurisdiction over Plaintiff's FLSA claims under 28 U.S.C. § 1331 because Plaintiff's claims arise under the FLSA. The Court also has jurisdiction under 28 U.S.C. § 1332(a)(1), because the amount in controversy in this action exceeds $75,000, exclusive of interests and costs, and because the parties are residents of different states.

14. Venue is proper under 28 U.S.C. §1391, because Defendant employs members of the proposed Collective and transacts business in this Judicial District, and a substantial part of the acts and/or omissions giving rise to the claims occurred in this District.

## III.     PARTIES

15. Plaintiff, Orson Judd, is a resident of Taylor, Arizona. Mr. Judd worked for Defendant as an Investigator in Arizona, between approximately June of 2008 and September of 2014. Throughout that time period, Defendant consistently classified Mr. Judd as an independent contractor and did not pay him any overtime or other benefits owed to employees. On August 20, 2015, Mr. Judd filed  a consent to join in an earlier filed case, *Richard Smith, et al. v. KeyPoint*

*Government Solutions*, Case No. 1:15-cv-00865 (D. Colo.) (hereinafter, "*Smith*"). On December 16, 2016, the court determined that the clams of Richard Smith were time-barred under the applicable statute of limitations and ordered dismissal of the case. The dismissal was without prejudice as to the claims of all investigators other than Mr. Smith. Accordingly, the statute of limitation was tolled for Mr. Judd throughout the pendency of the *Smith* Action, which concluded on January 20, 2017.

16.     Plaintiff's signed consent to join form is attached to this Complaint as Exhibit B.

17.     The Collective Action members are current or former Investigators who have worked for Defendant in the United States, while being classified by Defendant as independent contractors, at any time beginning three years before the filing of this Complaint and/or the filing of consents to become party plaintiffs (including the time period the claims of any Collective Action members were tolled by the filing of consents in the *Smith* case) plus additional time for periods of equitable tolling.

18.     Defendant Keypoint Government Solutions, Inc. ("Keypoint") is and at all relevant times has been engaged in the business of security-clearance background investigation and screening services across the United States.

19.     Defendant Keypoint is incorporated in Delaware, headquartered in Loveland, Colorado, registered to do business in the State of Arizona, under registration number F15087750. Defendant employs thousands of Investigators to perform work across the United States, including in this Judicial District, and is a resident of this Judicial District.

20.     Defendant Keypoint was formerly Kroll Government Services, Inc. ("Kroll"), also a Colorado corporation.  Kroll was Plaintiff's employer until 2009.  In 2009, Kroll was acquired by Veritas Capital Fund Management, L.L.C., and became Defendant Keypoint.

21.     Any reference to Defendant or Keypoint herein is intended to include both Keypoint and Kroll to the extent that any conduct by Kroll, or the consequences of any conduct by Kroll, extends into the period of time after Kroll changed to Keypoint.

## IV.     FACTUAL ALLEGATIONS

22.     KeyPoint is in the business of performing background investigations for the federal

government. KeyPoint describes itself as "the leading provider of security-clearance background investigations and screening services to the U.S. Government." Defendant classifies some Investigators as employees. Employee Investigators receive overtime pay and benefits, such as vacation, floating holidays, 401Ks, health insurance, mileage reimbursement, workers compensation insurance, short and long-term disability benefits and life insurance benefits. Plaintiff and the other similarly situated Investigators classified by Defendant as independent contractors, however, receive none of these benefits and do not receive overtime pay. The reason KeyPoint classifies them as independent contractors (rather than employees) is simply to allow KeyPoint to manage its workload by flexing up or down its workforce (and not because their work is categorically different from that of employees).

23.     KeyPoint hires Investigators to perform the integral role of KeyPoint's business, i.e., the Investigators' job is to complete the actual case investigations in the field where the case is assigned. The Investigators, like Plaintiff and other similarly situated individuals, all perform the same basic job: interviewing subjects, conducting public records searches, interviewing sources, and writing investigation reports. They all sign a standardized "Independent Contractor Engagement Agreement" (ICEA) with KeyPoint.

24.     The independent contractor agreement is terminable at-will by Defendant, and does not contain a notice requirement. Accordingly, the contractual agreement does not contemplate an end date to the business relationship. Plaintiff and other similarly situated Investigators often work for Defendant for several years. Ninety-five percent (95%) work for Defendant for more than one year, including Plaintiff.

25.     All the Investigators that KeyPoint hires as independent contractors work on investigations KeyPoint performs for either the Office of Personnel Management ("OPM") or Department of Homeland Security ("DHS"). Approximately 85% work on OPM, 15% work on DHS, and 5% work on both. Of the 15% that work on the DHS contract, at least 80% work on investigations pertaining to either Custom and Border Protection ("CBP") and/or Immigration and Customs Enforcement ("ICE").

26.     The Investigators receive all case assignments directly from KeyPoint. KeyPoint obtains a case investigation project from its client, and then divides the project into multiple sub-tasks that it then distributes to different Investigators. KeyPoint assigns work to the Investigators based on KeyPoint's own strategic and logistical needs, and the Investigators play no role in this process.

27.     The Investigators are completely dependent on the individual tasks KeyPoint makes available for them to complete. Investigators are prohibited from subcontracting out or assigning work to anyone else to perform. They do not have the independence to simply take on a project and decide who is going to perform it and how. Rather, the Investigators must personally perform all assigned tasks themselves.

28.     The clients belong to KeyPoint, not the Investigators, and the Investigators do not have access to or communicate with clients. In fact, Investigators have no role whatsoever in any of the negotiations that KeyPoint has with its clients that impact either the work made available to Investigators, the way in which the Investigators must perform their work, or the rates of pay ultimately offered to the Investigators.

29.     KeyPoint agrees with its clients to control the details of work performed by all the Investigators and KeyPoint maintains numerous uniform policies to manage the work of the Investigators.

30.     For example, KeyPoint enforces the multiple, detailed policies, procedures and techniques contained in the Investigator's Handbook. The Investigator's Handbook is nearly 550 single-spaced pages of detailed policies and procedures that Investigators must follow to complete work for KeyPoint. It even includes specific lines of questioning and questions that need to be adhered to in each interview conducted by an Investigator. The policies and procedures in the Investigator's Handbook are mandatory.

31.     Furthermore, KeyPoint has assumed responsibility for overseeing Investigators who are independent contractors to ensure that they are complying with the policies and procedures in the Investigator's Handbook. For example, KeyPoint enforces policies on the "proper process" for

contacting sources; how to use private information; how to keep handwritten notes, and the timing and method of shipping investigation notes to KeyPoint. KeyPoint also imposes deadlines on the Investigators based on deadlines KeyPoint has with its clients. KeyPoint is also responsible for ensuring compliance with the quality and timing standards set by KeyPoint's contracts with the government.

32.     KeyPoint's policies are mandatory and Investigators are expected to comply. If an Investigator fails to follow KeyPoint's numerous, detailed policies and procedures, KeyPoint reserves the right to take corrective action, up to and including termination.

33.     KeyPoint requires that the Investigators attend extensive training provided by KeyPoint before starting work. For work on the OPM project (approximately 80% of the Investigators), KeyPoint requires a total of 10 weeks of training. The first seven weeks are unpaid and include between six and eight hours of classroom work per day. After completing the classroom training, Investigators must then complete 80 hours of On-The-Job ("OTJ") training.

34.     KeyPoint also requires Investigators to complete annual training on security policies and procedures.

35.     KeyPoint's training provides Investigators with the necessary skills to perform their job, including procedures for conducting interviews, handling notes, transmitting reports, and conducting record searches. Investigators' training even includes detailed written instructions for the lines of questioning that should be pursued for each interview. KeyPoint provides such extensive training as a measure of accountability to its customer.  KeyPoint even monitors the Investigators' performance to determine if additional training is necessary.

36.     Keypoint imposes report completion deadlines on Plaintiff and other similarly situated Investigators.  The background checks usually must be completed within 2 weeks from the date they are assigned.

37.     Once Investigators accept an assignment, they are expected to meet a due-date established by KeyPoint based on what KeyPoint negotiates with its clients. Investigators cannot renegotiate deadlines with KeyPoint's clients.

38.     The Investigators must complete the necessary interviews, perform the necessary document searches, and write the necessary reports in accordance with KeyPoint's policies, deadlines and quality control standards. The end product is a "Report of Investigation" that KeyPoint submits to its client. For work provided to OPM, KeyPoint has a team of "Case Review Analysts" that review each report before it is deemed fit for the client. For the DHS project, KeyPoint has three levels of internal review before it goes to the client. If KeyPoint determines a report does not meet all the standards and requirements, the Investigator must rewrite it.

39.     Throughout the process, Keypoint provides the Investigators with guidance and mentoring by assigning them "Contract Liaisons" and "Case Managers." The Case Managers and Contract Liaisons are employees of KeyPoint who "take ownership of the case" and "manage the case through to the end." KeyPoint also has a "Policy and Guidance" Department that provides uniform guidance to Investigators in the field as to how to interpret and follow policy.

40.     In addition to the multi-layer report review process, KeyPoint also subjects the Investigators to random audits and internal inspections to ensure they comply with the "proper process." KeyPoint will re-contact 10% of sources in order to determine if an Investigator followed proper procedure. KeyPoint also monitors Investigators' emails to ensure compliance with KeyPoint's security protocols and keeps track of complaints filed against the Investigators.

41.     KeyPoint evaluates Investigators based on a set of 78 standards. When they fail to comply with KeyPoint policies, KeyPoint sends Investigators a letter of violation. The Investigator must reply, confirming agreement to next time follow the "proper process." If KeyPoint determines that an Investigator did not follow "proper process," KeyPoint may require additional corrective action, such as retraining. In some cases, KeyPoint's corrective action may include termination.

42.     The Investigators do not "invest" in their own businesses. Conversely, KeyPoint invests over $12,000 into each Investigator to provide mandatory training and credentials. Investigators also receive a laptop, software, and security equipment. They do not invest time or resources into developing relationships with KeyPoint's clients. They do not invest in additional employees to perform work. In fact, KeyPoint requires the Investigators to personally perform all the

tasks themselves.

43.    The only investment Investigators make into their "business," is for transportation, paper, pens, a printer, and sometimes a fax machine. KeyPoint provides everything else Investigators need to receive and complete their tasks.

44.    At the same time, every Investigator's opportunity for profit is constrained by the work that KeyPoint decides to make available. KeyPoint also limits Investigators' opportunities for profit and loss by paying them all on a similar piece-rate structure. Under certain circumstances, Investigators may ask for premium pay for specific work, but only 12-15% of assignments include premium pay. KeyPoint affords its Contract Liaisons limited authority to grant premium pay. The only ways that Investigators can control profits and losses is to accept more work from what KeyPoint makes available, work more efficiently on their tasks, and/or drive a less expensive car.

45.    Still, Investigators work for KeyPoint on a continuous basis. Ninety-five percent (95%) of Investigators remain with KeyPoint for more than one year.  Indeed, the standardized agreement KeyPoint requires all Investigators to sign obligates them to repay KeyPoint for up to $5,000 in training expenses if they leave KeyPoint within a year.  KeyPoint also keeps Investigators working regularly and continuously by enforcing a policy that Investigators must work at least once every 30 days to stay credentialed.

46.    KeyPoint has no degree requirements for its Investigators. KeyPoint's only specific requirement is that the Investigator complete the training KeyPoint provides. KeyPoint's training is designed to provide Investigators with the specialized skills required for the job. All Investigators attend the same training to develop the skills necessary to work for KeyPoint.

47.    As indicated above, the work Defendant requires and/or suffers and permits Plaintiff and other similarly situated Investigators to perform can be divided into two broad categories: (1) investigative tasks; and (2) report writing.  Plaintiff and other similarly situated Investigators generally must perform the investigative tasks during traditional business hours because public records and interview subjects tend to be unavailable outside of these hours.  Consequently, report writing and related tasks often must be performed outside of traditional business hours.  The

investigative work alone is substantial, and regularly demands at least 40 hours of work per week, per Investigator. Combined with the report writing, Plaintiff and the other similarly situated Investigators must regularly work well over 40 hours per week. Indeed, given the nature of investigative work and timing restrictions on investigative tasks, Plaintiff and other similarly situated Investigators regularly work substantial overtime hours to meet the deadlines set by Defendant. Yet, Defendant does not pay Plaintiff or other similarly situated Investigators for all these hours, and does not pay them at one and one-half times their regular rate for hours over 40 in a week.

48. Defendant compensates Plaintiff and other similarly situated Investigators for work performed on the Office of Personnel Management contract with a flat fee. For all other work, Defendant compensates Plaintiff and other similarly situated Investigators pursuant to a standard "Project Structure Fee," under which all payments are broken into "source units." For example, subject interviews are considered 4 source units, and reference interviews are considered 1 source unit, even if they take the same amount of time to complete. Defendant presents the compensation terms to Plaintiff and other similarly situated Investigators on a "take-it-or-leave-it" basis.

49. Plaintiff and other similarly situated Investigators also incur substantial out-of-pocket expenses in the form of mileage and office supplies, among other resources. Despite these significant expenditures, Plaintiff and other similarly situated Investigators invest little in their "businesses" besides gas money, office supplies, and a phone, which in reality are the Defendant's costs of doing business. As a general matter, Plaintiff and other similarly situated Investigators do not have or work through a genuine "business" in any meaningful sense, but simply work as employees of Defendant.

50. Plaintiff and other similarly situated Investigators perform their work according to instructions set by Defendant and communicated to Plaintiff and other similarly situated Investigators during the lengthy trainings and mentoring programs to ensure that work is performed according to Defendant's precise specifications.

51. As noted above, this action follows an earlier filed action against Defendant, *Richard*

*Smith, et al. v. KeyPoint Government Solutions*, Case No. 1:15-cv-00865 (D. Colo.) ("*Smith*

Action"). During the pendency of the *Smith* Action, Defendant required all of its Investigators to

execute new contracts, which included an arbitration agreement and collective action waiver.

However, because the Ninth Circuit has held that collective action waivers such as the one contained

in Defendant's arbitration agreement are unenforceable under the National Labor Relations Act (see

*Morris*, 834 F.3d 975, Plaintiff is entitled, under the law of this Circuit, to pursue his claims in this

Court action.

## V. COLLECTIVE ALLEGATIONS

52.     Plaintiff brings this action as an "opt-in" collective action pursuant to 29 U.S.C. §

216(b), on behalf of himself and a proposed Collective of similarly situated employees defined as:

> "All individuals who have worked for Defendant as Investigators in the United States, while
> being classified as independent contractors, at any time beginning three years before the
> filing of this Complaint and/or the filing of consents to become party plaintiffs (including the
> time period the claims of any Collective Action members were tolled by the filing of
> consents in *Richard Smith, et al. v. KeyPoint Government Solutions*, Case No. 1:15-cv-00865
> (D. Colo.)), plus additional time for periods of equitable tolling."

53.     Plaintiff, on behalf of himself, and on behalf of other similarly situated employees

defined above, seeks relief on a collective basis challenging Defendant's policy of misclassifying

Investigators as independent contractors, and failing to pay them for all hours worked, including

overtime compensation.  The number and identity of other similarly situated persons yet to opt-in as

party-plaintiffs may be determined from the records of Defendant, and potential opt-ins may be

easily and quickly notified of the pendency of this action.

54.     This case is well suited for certification as a collective action because the independent

contractor misclassification issue will be answered with common proof for Plaintiff and the other

similarly situated individuals.

55.     The test for determining whether KeyPoint has misclassified its Investigators as

independent contractors contains the following factors: 1) The degree of the alleged employer's right

to control the manner in which the work is to be performed; 2) the alleged employee's opportunity

for profit or loss depending upon his managerial skill; 3) the alleged employee's investment in

equipment or materials required for his task, or his employment of helpers; 4) whether the service rendered requires a special skill; 5) the degree of permanence of the working relationship; 6) whether the service rendered is an integral part of the alleged employer's business. *Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1370 (9th Cir. 1981). Plaintiff and the other investigators are similarly situated with respect to these factors:

(a) **Investigators Are Similarly Situated With Regard To KeyPoint's Right to Control The Details of The Work.** Here, as shown above, KeyPoint has agreed with its government clients to maintain and enforce multiple, detailed procedures and standards pertaining to quality, performance and timing of all work performed by the Investigators. These standards are highly similar, if not uniform, across the proposed collective. KeyPoint also provides standardized training and common guidance to the Investigators. It further maintains a common procedure for reviewing the reports the Investigators prepare, randomly auditing the conduct of Investigators in the field to ensure compliance with the "proper process," and issuing corrective action up to and including termination if the Investigators repeatedly do not follow the rules.

(b) **Investigators Are Similarly Situated With Regard To Their Opportunity For Profit And Loss Based on Managerial Skill.** KeyPoint's Investigators are similarly situated with respect to the opportunity for profit and loss for several reasons. First, KeyPoint pays them pursuant to a common piece rate structure. Second, while KeyPoint may provide an opportunity to seek premiums for individual tasks, this opportunity is applicable to all Investigators and, in each case, the ultimate authority to grant or deny the premium rests with KeyPoint. Indeed, KeyPoint approves premium pay to only 12-15% of the assignments. Third, the Investigators receive their work assignments directly from KeyPoint, not from the client, and have no authority to offer services to, or negotiate directly with, the client to obtain a better pay rate or more flexible procedures for performing the work. Fourth, while Investigators may be able to decline their assignments, they have no control over what KeyPoint makes

available, which ultimately is what dictates their earning potential. Fifth, once Investigators accept an assignment, they must perform the work according to the deadlines and parameters that flow from the contracts KeyPoint has negotiated with its clients. Finally, KeyPoint prohibits Investigators from delegating or subcontracting work, even if that would allow them to earn more money. All these facts and considerations are similar if not uniform across the collective.

(c) **Investigators Are Similarly Situated With Regard To How Integral They Are To The Business.** This factor will be resolved in common for all Investigators because they all perform the same essential job. KeyPoint admits that Investigators are integral to KeyPoint's business because they are responsible for carrying out the actual work necessary for KeyPoint to fulfill its contracts with DHS and OPM. Furthermore, KeyPoint admits that it only classifies Investigators as Independent Contractors to maintain a more flexible workforce, and not because Investigators perform some collateral function to KeyPoint's business.

(d) **Investigators Are Similarly Situated With Regard To Their Investment In Their Business.** KeyPoint spends over $12,000 per Investigator to provide the required training and credentials. KeyPoint also provides the computers and software. In contrast, Investigators only invest resources in basic equipment such as office supplies, potentially a printer, and basic travel. Investigators do not invest time or resources in soliciting new business for KeyPoint or developing relationships with KeyPoint's clients. They are explicitly prohibited from investing any resources into hiring other employees or subcontracting out work.

(e) **Investigators Are Similarly Situated With Regard To The Contractual Terms Controlling The Permanence If Their Working Relationship With KeyPoint.** KeyPoint engages with Investigators as Independent Contractors for an extended period of time involving multiple assignments rather than periodically for discrete assignments. At least 95% of Investigators work for KeyPoint for more than a year.

Furthermore, KeyPoint requires that Investigators reimburse KeyPoint for up to $5,000 if the Investigator leaves KeyPoint before one year.

(f) **Investigators Are Similarly Situated With Regard To The Degree Of Skill Required For Their Work.** KeyPoint maintains uniform, standardized job qualifications for all its Investigators. Investigators do not need a specialized degree or previous job. Moreover, to the extent that the required knowledge or skills vary for the work provided by KeyPoint, KeyPoint also provides the required training to ensure that its Investigators have the necessary skills.

56.     Additionally, Plaintiff's underlying overtime claims will be resolved in common for all similarly situated individuals, as KeyPoint admits it does not pay the Investigators overtime and thus liability will turn entirely on whether the Investigators are misclassified as Independent Contractors.

## FIRST CAUSE OF ACTION
### VIOLATION OF THE FAIR LABOR STANDARDS ACT,
### 29 U.S.C. § 201, et seq. FAILURE TO PAY OVERTIME WAGES

57.     Plaintiff and other similarly situated Investigators re-allege and incorporate all previous paragraphs herein.

58.     The FLSA requires that employers whose employees are engaged in commerce, engaged in the production of goods for commerce, or employed in an enterprise engaged in commerce or in the production of goods for commerce pay their employees overtime wages at one and one-half their regular rate for hours worked in excess of 40 hours during a workweek.  29 U.S.C. §§ 207.

59.     Defendant is covered by the FLSA and has violated the FLSA by failing to pay Plaintiff for all time worked, including overtime pay, because it has misclassified Plaintiff and other similarly situated Investigators as independent contractors.

60.     Plaintiff and other similarly situated Investigators are victims of a uniform and company-wide compensation policy that systematically denies them their statutorily mandated overtime premium pay.  This uniform policy, in violation of the FLSA, has been applied to all

Investigators classified as independent contractors by Defendant throughout the United States.

61.    Defendant's conduct in misclassifying Plaintiff and other similarly situated Investigators as independent contractors has been willful.  Defendant has done it to avoid paying premium overtime pay and the other benefits to which Plaintiff and other similarly situated Investigators are entitled. Furthermore, and as set forth above, Defendant has been aware that its conduct violates the FLSA since at least September of 2011.

62.    The foregoing conduct, as alleged, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a), as Defendant has known that its classification of Investigators as independent contractors violates the FLSA since at least September 29, 2011, when the Department of Treasury concluded that Defendant had misclassified a California-based Investigator as an independent contractor when in fact he was an employee. See Ex. A. That Investigator, Michael Sgherzi, later filed a class action under California law in or around June of 2014, which included claims for violations of the FLSA. As a result of the California lawsuit, Defendant reclassified its Investigators in California as employees, but did not reclassify Investigators in other states. Plaintiff and all similarly situated employees therefore are entitled to all damages owed for the limitations period beginning three years preceding the filing of this Complaint and/or the filing of consents to become party plaintiffs (including the time period the claims of any Collective Action members were tolled by the filing of consents in *Richard Smith, et al. v. KeyPoint Government Solutions*, Case No. 1:15-cv-00865 (D. Colo.)), plus additional time for periods of equitable tolling.

63.    Plaintiff and other similarly situated employees are entitled to recover an award in the amount of their unpaid overtime compensation.

64.    Plaintiff and other similarly situated employees are entitled to recover an additional award of liquidated damages in an amount equal to the amount of unpaid overtime pay, and/or prejudgment interest at the applicable rate.  29 U.S.C. § 216(b).

65.    Employers subject to the FLSA must "make, keep, and preserve" accurate records of all hours worked and the wages, hours, and other conditions and practices of employment.  29 U.S.C. § 211(c).  It is unlawful for any person to violate § 211(c).  29 U.S.C. § 215(a)(5).

66. 29 C.F.R. § 516.2 and 29 C.F.R. § 825.500 further require that every employer shall maintain and preserve payroll or other records containing, without limitation, the total hours worked by each employee each workday and total hours worked by each employee each workweek.

67. Defendant has failed to maintain all records required by the aforementioned statutes and regulations, and failed to furnish Plaintiff and other similarly situated Investigators comprehensive statements showing the hours they worked during the relevant time period.

68. Where an employer's records are inaccurate or inadequate, employees need only produce sufficient evidence to show the amount and extent of the work as a matter of just and reasonable inference to prove they were improperly compensated. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946). If an employer is unable to rebut the reasonableness of this inference, the court may award damages to the employee, even if the result "be only approximate." *Id.*

69. Plaintiff and other similarly situated Investigators are entitled to their unpaid overtime wages plus an additional equal amount in liquidated damages, costs, and reasonable attorneys' fees. 29 U.S.C. § 216(b).

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the proposed Collective they seek to represent in this action, requests the following relief:

a) For an order certifying that this Complaint may be maintained as a collective action pursuant to 29 U.S.C. § 216(b) and that prompt notice of this action be issued to potential members of the Collective, apprising them of the pendency of this action, and permitting them to assert their FLSA claims;

b) For an order equitably tolling the statute of limitations for the potential members of the Collective;

c) For an order awarding Plaintiff and the Collective compensatory and statutory damages (including liquidated damages), including lost wages, earnings, and all other sums of money owed to Plaintiff and members of the Collective, together with interest

on these amounts;

d) For an order directing Defendant to identify, locate and restore to all current and former Investigators classified as independent contractors the restitution and compensation they are due for lost wages, earnings, and other sums of money, together with interest on these amounts.

e) For a declaratory judgment that Defendant has willfully violated the FLSA and public policy as alleged herein.

f) For pre- and post-judgment interest;

g) For an award of reasonable attorneys' fees as provided by the FLSA;

h) For all costs of suit; and

i) For such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated: March 9, 2017

                                      SCHNEIDER WALLACE
                                      COTTRELL KONECKY WOTKYNS LLP

                       By:    */s/ Michael C. McKay*
                                  MICHAEL C. MCKAY
                                  Attorney for Plaintiff and the Proposed Collective

## DEMAND FOR JURY TRIAL

Plaintiff Orson Judd by and through his attorney, hereby demand a jury trial on all claims and issues for which Plaintiff and the Collective are entitled to a jury.

Respectfully submitted,

Dated: March 9, 2017

SCHNEIDER WALLACE
COTTRELL KONECKY WOTKYNS LLP

By:    /s/ *Michael C. McKay*
MICHAEL C. MCKAY
Attorney for Plaintiff and the Proposed Collective

# CERTIFICATE OF SERVICE

I hereby certify that on March 9, 2017, I electronically filed the foregoing document with the Clerk of the Court using the Court's CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants.

_/s/ Michael C. McKay_
Michael C. McKay (SBN 023354)
SCHNEIDER WALLACE
COTTRELL KONECKY WOTKYNS LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
mmckay@schneiderwallace.com